DGW KRAMER LLP
Jacob Chen, Esq.
45 Rockefeller Plaza, 20th Floor
New York, NY 10111
Telephone: 917-983-2806
Email: jchen@dgwllp.com

Attorneys for Plaintiffs and the Proposed Class

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

ABIGAIL BARE, ARLENA YAGECIC, JIMI FRANKLIN, and MADELINE SIERKA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Civil Action No.: 1:25-cv-09415

Plaintiffs,

-against-

160 FRONT STREET ASSOCIATES LLC, SAMSON MANAGEMENT LLC, and SAMSON FUNDING CORPORATION

Defendants.

------------------------------------------------------------------x

**CLASS ACTION COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiffs Abigail Bare ("Bare"), Arlena Yagecic ("Yagecic"), Jimi Franklin ("Franklin"), and Madeline Sierka ("Sierka"), and individually and on behalf of all others similarly situated, by their attorneys, DGW Kramer LLP, hereby allege as follows:

## PRELIMINARY STATEMENT

1. This is a class action brought by the tenants and former tenants of 160 Front Street against 160 Front Street Associates LLC, Samson Management LLC, and their affiliate

Samson Funding Corporation, arising from years of neglect and gross mismanagement that reduced a residential building to uninhabitable squalor—overflowing trash chutes, pervasive vermin, sexual harassment from superintendents, collapsed ceilings, dead security cameras, a front door that barely latched, and broken buzzers that left families unsafe—while tenant complaints were ignored, repairs delayed or denied, rent still demanded and raised, and for tenants constructively evicted, security deposits never returned.

2. Defendants are **slumlords**, who have flouted the warranty of habitability, health and safety codes, and basic decency to maximize profit at the expense of the people who live there.

3. Plaintiffs seek relief under federal and state law for compensatory and punitive damages, statutory penalties, and immediate injunctive relief to end these unlawful conditions and hold Defendants accountable, on behalf of themselves and all current and former tenants who have been similarly affected by Defendant's conduct.

## PARTIES

4. Plaintiffs are all tenants or former tenants at 156 Front Street a.k.a. 160 Front, Street, New York, NY 10038 (the "Building").

5. The Building is a 63 unit residential elevator building, located in the Financial District in Manhattan.

6. Plaintiff Franklin is a tenant at the Building at all relevant times.

7. Plaintiff Yagecic is a tenant at the Building at all relevant times.

8. Plaintiffs Sierka and Bare are former tenants at the Building and were constructively evicted from their home as a result of the Building's uninhabitable conditions.

9. Defendant 160 Front Street Associates LLC (the "Owner") is a limited liability

company organized under the laws of the State of New York, is the nominal owner of the Building, and an affiliate of the Management Company and the Lender.

10. Defendant Samson Management LLC (the "Management Company") is a limited liability company organized under the laws of the State of New York that manages, operates, maintains, and/or controls the Building, and an affiliate of the Owner and Lender.

11. Defendant Samson Funding Corporation (the "Lender") is a domestic business corporation organized under the laws of the State of New York, and is an affiliate of the Owner and the Management Company.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this case arises under the laws of the United States, including the Fair Housing Act, 42 U.S.C. §§ 3601–3617; the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.; and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

13. This Court also has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal causes of action that they form part of the same case or controversy under Article III of the United States Constitution. All claims arise from a common nucleus of operative fact—namely, Defendants' systemic misconduct in the operating and managing of, and in the collecting of unlawful payments from the tenants of, the Building.

14. This Court has personal jurisdiction over Defendants because Defendants are domestic limited liability companies and domestic corporations that conduct substantial business in, and maintain their principal place of business within the State of New York, and because the acts and omissions giving rise to this lawsuit occurred within this District.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims—including the collection of rent and deposits, issuance of deceptive communications, and operation and management of the subject property—occurred in this District.

16. In addition, this case concerns and seeks relief regarding the operation and management of 160 Front Street, New York, New York 10038, which is located within this District.

## PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

### Plaintiff Jimi Franklin

17. Franklin moved into the Building on or about April 1, 2021, and has resided there since, and is currently a month-to-month tenant.

18. From the outset of his tenancy, Franklin experienced persistent rodent activity inside his apartment.

19. On multiple occasions beginning in or about April 2021, Franklin observed fresh mouse droppings in his kitchen and living areas.

20. On more than one occasion, mice were present on Franklin's bed and beneath his pillows while he was sleeping.

21. Franklin promptly notified Defendants' managing agent(s) and building personnel of the rodent activity by email and text and requested comprehensive extermination and sealing of entry points.

22. In response, Defendants' exterminator made sporadic visits that focused primarily on bait and glue traps, without performing comprehensive sealing of penetrations.

23. These limited and sporadic measures were completely ineffective, and rodent activity resumed repeatedly after each visit.

24. After weeks of inadequate responses, Franklin sent a written, certified letter to Defendants demanding proper remediation.

25. Only following that certified notice did Defendants remove Franklin's dishwasher and perform some sealing work around visible penetrations.

26. The work performed provided temporary relief but did not address all pathways, and rodent activity later resumed.

27. Throughout the tenancy, Franklin heard rodents inside the apartment walls and observed rodents and/or signs of rodents in common areas of the Building, including the entrance and basement.

28. In addition to vermin conditions, Franklin routinely encountered other unsanitary and unsafe conditions in the Building's common areas.

29. The basement laundry and trash rooms repeatedly flooded, especially following rain events.

30. Standing, foul-smelling water remained for days at a time—often approaching a week—due to inadequate cleanup and drying, with the filthy water sometimes an inch high.

31. The flooding and sanitation failures created and worsened rodent harborage and made use of the laundry facilities unpleasant and unsanitary.

32. With respect to safety, the Building's front vestibule door frequently failed to self-close and latch.

33. Because the vestibule door was often unsecured, non-residents were able to gain access to the foyer and interior common areas.

34. Franklin observed and/or was informed of intrusions and loitering by non-residents in the foyer area which made him feel fundamentally unsafe in his own home and building.

35. During extended periods, lobby/entrance cameras were inoperative or otherwise ineffective, reducing safety and deterrence.

36. Franklin's apartment intercom/buzzer was nonfunctional for prolonged periods.

37. Because of the broken intercom/buzzer, Franklin was required to go downstairs to admit visitors and delivery personnel.

38. Packages addressed to Franklin were stolen from the vestibule on multiple occasions.

39. Essential services in the Building—including heat—were not reliably provided.

40. During the 2024–2025 heating season and again thereafter, Franklin experienced heat outages and inadequate indoor temperatures during legally required heating hours.

41. Franklin notified building personnel, including the then-current superintendent, about the heat lapses.

42. Rather than timely restoring heat, the superintendent gave evasive responses and referenced an old 311 report unrelated to the ongoing outage.

43. Franklin's refrigerator leaked at recurring intervals—approximately every six months—spoiling groceries and creating slip hazards.

44. Franklin reported the refrigerator leaks; management's responses were delayed or non-responsive until Franklin escalated his requests.

45. Across these issues, Defendants exhibited a pattern of slow, superficial, or nonexistent responses to Franklin's repair and service requests.

46. Extermination efforts remained reactive and piecemeal, relying on poison and traps without implementing a Building-wide integrated pest-management plan that included comprehensive sealing of penetrations and elimination of harborages.

47. Security and access-control defects—including the vestibule door failure, inoperative cameras, and nonfunctional intercom—persisted for extended periods despite notice.

48. Sanitation failures—including chronic trash problems and repeated basement flooding—persisted for extended periods despite notice.

49. Franklin continued to pay rent while enduring these uninhabitable conditions and diminished use and enjoyment of the apartment.

50. When Franklin exercised his rights to complain and/or contact authorities, Defendants and their agents responded with hostility.

51. On one occasion, the property manager stated to Franklin, in substance, “I know you called 311; now I know who I’m dealing with.”

52. Defendants’ statements and conduct were reasonably understood by Franklin as retaliatory and intended to chill further complaints.

53. The cumulative effect of the rodent infestation, sanitation failures, flooding, security/access defects, heat lapses, appliance leaks, and retaliatory conduct substantially interfered with Franklin’s health, safety, and use and enjoyment of his home.

54. At all relevant times, Defendants had actual and/or constructive notice of the foregoing conditions through Franklin’s complaints, the visible and recurring nature of the defects, and complaints by other tenants, yet failed to timely and adequately abate them.

55. As a direct and proximate result, Franklin suffered damages including but not limited to rent paid for diminished value, loss of use and enjoyment, property loss, time and

expense of self-help measures, and emotional distress associated with unsafe and unsanitary living conditions.

**Plaintiff Arlena Yagecic**

56. Yagecic moved into the Building on or about November 1, 2020, and has resided there continuously to the present. From the very outset of her tenancy, she encountered severe, recurring conditions that rendered her apartment and the Building unsafe, unsanitary, and uninhabitable.

57. Immediately upon moving in, Yagecic discovered that the basement was filled floor to ceiling with uncollected garbage. The refuse obstructed the sole stairwell egress and emitted a pervasive odor of rot and decay. Within the piles of garbage, she could hear rats squeaking and moving.

58. At first, Yagecic believed these conditions were temporary, possibly related to the COVID-19 pandemic or a missed trash pickup. However, she soon learned that the accumulations were chronic and stemmed from Defendants' long-standing neglect.

59. Building policy required tenants to place refuse in the trash chutes and recycling in the basement. In practice however, the trash chutes were chronically clogged, forcing Yagecic and other tenants to constantly have to carry their garbage to the basement, where it was stacked in open piles. Over time, the basement became impassable, and the conditions created a serious health, fire and egress hazard.

60. Yagecic *repeatedly* complained to Defendants through text messages to superintendent Adnan Hoti ("Adnan"), emails to management (including one titled *"Send Help!"*), and calls to 311. Despite these efforts, Defendants took no meaningful action.

61. Rather than acknowledging responsibility, Adnan routinely blamed tenants for the

filth, accusing them of failing to break down boxes or clean up after pets. After years of sustained tenant pressure, Defendants finally started to move the waste into a separate "trash room." However, even after this minor improvement, the accumulation of garbage, vermin, and stench persisted.

62. The unsanitary conditions directly fueled persistent rodent infestation. In or about the fall of 2022, Yagecic observed a mouse crawling in her kitchen. Days later, while sitting on her couch, another mouse ran across her shoulders.

63. She immediately reported these incidents to Adnan and management, but her complaints were, as usual, ignored for several days. When the exterminator finally arrived, he used roach spray and took no steps to identify or seal rodent entry points.

64. Frustrated by Defendants' inaction, Yagecic purchased traps, caulk, and steel wool and sealed holes herself. Although these self-help efforts temporarily reduced mouse activity, she continued to constantly hear the noise of rats in her walls and ceiling thereafter, which made it challenging for her to rest every night.

65. In or about October 2024, Yagecic's living conditions deteriorated further due to extreme overheating from the Building's malfunctioning boiler system.

66. With her radiator valves fully closed, her apartment remained around 80°F; when opened, the temperature exceeded 100°F.

67. That month, the basement boiler began violently banging, sounding like it was going to explode, and generating oppressive heat that filled the lobby. The conditions were so severe that the Fire Department had to be called on or about October 11, 2024, to shut down the boiler.

68. Yagecic and other tenants emailed management and contacted the new

superintendent, Benny Bicaj ("Benny"), about the hazard. Benny repeatedly denied that any issue existed, and management never responded.

69. Both Adnan and Benny were unqualified and unprofessional. Adnan had previously been arrested for driving under the influence while in possession of a loaded firearm, threatening officers that he would "kill everyone there," as reported in a December 2022 *Staten Island Live* newspaper article. Benny, his successor, routinely responded to tenant complaints with hostility, shouting at tenants and making inappropriate remarks such as, *"What do you want me to do—kill myself?"*

70. During the summer of 2024, Yagecic experienced a bedbug infestation. She began suffering nightly bites and observed visible bugs on her mattress and couch. She promptly reported the problem to management, who sent an exterminator who claimed to find no evidence of bedbugs and took no remedial action.

71. Yagecic discarded her mattress, sanitized her apartment at her own expense, and purchased a replacement, only to suffer new bites weeks later. She again reported the infestation, and the same exterminator performed another ineffective spray treatment.

72. In a Building's tenant WhatsApp group, multiple residents—including one named Shu Wei—reported similar infestations and severe skin irritation. Despite these reports, Defendants failed to perform building-wide treatment or disclose the scope of the infestation to tenants.

73. Unable to rely on management, Yagecic purchased a cot, applied diatomaceous earth, hired a bedbug-sniffing dog service, and rented a storage unit to isolate her belongings. During both infestation periods, she was displaced for weeks, sleeping on friends' couches or in hotels, and spent thousands of dollars on temporary housing and remediation.

74. On or about October 11, 2024, Yagecic suffered an additional hazard after Benny had attempted a "repair" on the lock for Yagecic's door, reversing the internal casing so that it locked automatically from the inside—a defect that made the unit unsafe for occupancy. On that day, the auto-lock mechanism om Yagecic's door triggered trapping Yagecic in her apartment. Yagecic was forced to summon an emergency locksmith, who drilled through the lock and charged $1,200 for services.

75. This, combined with the overheating and boiler instability instilled in Yagecic severe emotional harm at the thought that if a fire broke out, she would have no ability to escape the apartment.

76. Throughout her tenancy, Yagecic has repeatedly contacted Defendants to report dangerous conditions, including vermin, trash accumulation, heating failures, leaks, and code violations such as the absence of required superintendent signage.

77. On or about April 1, 2025, Yagecic personally witnessed water leaking through the lobby ceiling, forming large puddles. The source of the leak was later identified as the bathroom of Unit 3F. Tenants were forced to place buckets to catch the water themselves because management and maintenance staff were unresponsive.

78. Neither Benny nor his temporary replacement answered calls, and management ignored multiple written reports. The leaks persisted through the rainy season, leading tenants to suspect widespread mold. Several residents, including Yagecic, reported respiratory irritation consistent with mold exposure.

79. The cumulative effect of these conditions—including chronic garbage accumulation, pervasive vermin, unsafe overheating, unqualified staff, pest infestations, defective locks, and water leaks—has substantially interfered with Yagecic's health, safety, and

use and enjoyment of her home.

80. Despite years of notice and repeated complaints, Defendants ignored, delayed, or superficially addressed each issue. As a direct and proximate result, Yagecic has suffered loss of use and enjoyment, substantial out-of-pocket expenses, and ongoing emotional distress from living in unsafe and unsanitary conditions.

**Plaintiffs Madeline Sierka and Abigail Bare**

81. Sierka and Bare are former tenants at the Building.

82. Their lease at the Building started on or about February 1, 2021.

83. On the very first day, a neighbor knocked on their door and asked there were mice in their apartment. To which the answer quickly turned out to be a resounding yes.

84. From the outset of their tenancy, Sierka and Bare experienced persistent rodent activity inside the apartment.

85. Beginning in or about February–March 2021, they observed fresh mouse droppings in the kitchen and living areas on a recurring basis.

86. Mice were repeatedly observed on the stove, in cabinets, and traversing common food-prep surfaces.

87. Rodent activity spiked each winter, with increased sightings and droppings during colder months.

88. On multiple occasions, rodents were present in the bedroom areas; at least one incident involved a mouse crossing Sierka's body in bed while she was asleep.

89. Sierka and Bare promptly and repeatedly notified Defendants' agents and building staff and requested comprehensive extermination and sealing of entry points.

90. In response, Defendants engaged in sporadic extermination efforts that relied

primarily on bait and glue traps without comprehensive sealing of penetrations or elimination of harborages.

91. These limited measures were highly ineffective. Bare in fact witnessed more than once mice escaping the glue traps.

92. The vermin problem was not limited to mice, and Sierka and Bare also saw other vermin including cockroaches in their bedroom.

93. At first, they only saw rats in the basement area.

94. In 2025, the vermin problem escalated from mice to rats inside their apartment.

95. In or about February–March 2025, Sierka and Bare documented fresh rat droppings, gnawed food packaging, and audible rat activity within the kitchen walls.

96. A plaster "patch" under the sink designed to block entry was chewed through within approximately one day, evidencing ongoing unsealed penetrations.

97. Sierka and Bare repeatedly contacted Defendants and their agents by phone, email, and text regarding the rat infestation and requested urgent remediation.

98. Sierka and Bare's calls and messages often went unanswered or rolled to voicemail; when responses occurred, they were delayed and non-substantive.

99. On or about March 5, 2025, Sierka and Bare notified the current superintendent, Benny Bicaj, of the infestation. Superintendent Bicaj arrived the same day and attempted to address the problem by filling a visible hole under the kitchen sink with plaster, which he identified as a potential point of entry.

100. By the following day, March 6, 2025, Sierka and Bare discovered that the plaster had been chewed through, and they attempted to contact Superintendent Bicaj again but received no response. They subsequently purchased pest-control supplies at their own expense and

attempted to reseal the area.

101. One week later on March 14, 2025, Sierka and Bare witnessed two large rats running about their kitchen space.

102. Sierka and Bare also attempted to contact the Management Company to report the worsening situation but were instead forwarded to a voicemail inbox, where they left a message detailing their situation.

103. On or about March 15, 2025, Sierka and Bare retained a licensed exterminator at their own expense due to the urgent nature of the infestation. The exterminator advised that he could only seal access points and set traps, and warned that the problem appeared to be building-wide in origin.

104. Sierka and Bare temporarily relocated for several nights for health and safety reasons, returning during daytime hours to monitor the situation. Each time they returned, they observed new evidence of infestation — including fresh feces, disturbed traps, and audible rat activity behind the walls.

105. On March 17, 2025, Sierka and Bare submitted a written complaint to the Management Company via email, detailing the condition of their apartment and requesting immediate remediation.

106. When no response was received, Sierka and Bare submitted a follow-up email on March 20, 2025. The Management Company never provided a direct response.

107. A major factor that likely contributed to the vermin harborage was the trash mismanagement and chute/garbage accumulations in the Building.

108. Sierka and Bare routinely saw trash accumulate in the building that went from floor *to the ceiling*.

109. The vermin was not the only problem that plagued them.

110. In the first half of 2022, Sierka and Bare noticed water staining, sagging, and active dripping in the ceiling of their bathroom which was of major concern.

111. Bare texted Adnan, the building superintendent multiple times to express her concerns, but was brushed off. Adnan said that the ceiling looked fine and took no remedial actions whatsoever.

112. And then one day, the ceiling simply collapsed entirely.

113. Sierka and Bare were forced to use the bathroom of another vacant unit on the same floor, and could not use their own bathroom.

114. Following the collapse, Defendants performed a patch repair rather than comprehensive remediation of the underlying condition.

115. Sierka and Bare's experiences were not unique to the tenants of the Building. During this time period, other units in the Building also experienced ceiling failures; and at least one tenant was displaced for approximately three months.

116. And then there was the issue with respect to the superintendent then assigned to the Building, Adnan. During Adnan's tenure, he *repeatedly* engaged in sexual harassment against Plaintiffs and other female tenants.

117. Adnan lingered in Sierka and Bare's apartment without a legitimate work purpose and smoked on their balcony specifically because their apartment was occupied by two women, often looking at them for long periods of time that made Sierka and Bare deeply uncomfortable.

118. Adnan asked Sierka and Bare for alcohol while on the job and placed late-night phone calls to Plaintiffs at approximately 2–3 a.m., including solicitations for Adderall despite there never having been offered or provided any by Sierka or Bare.

119. The primary purpose of the calls appeared to be to establish inappropriate personal contact and engage in conversation that was sexually suggestive in nature, wholly unrelated to any legitimate work matter. These calls occurred in the middle of the night, at hours when tenants would ordinarily be in bed or preparing to sleep, thereby magnifying the intrusiveness and impropriety of the communications. These late night calls would only be made to female tenants like Sierka and Bare.

120. In addition, Adnan made multiple quid-pro-quo insinuations of repairs to multiple young female tenants. With respect to at least one female neighbor, Adnan made an outright quod-pro-quo offer, stating to her that he would prioritize repairs to her apartment if she would go out on a date with him.

121. Adnan's conduct created fear and extreme discomfort for Sierka and Bare and contributed to a hostile living environment.

122. In the absence of any action by Defendant and in the face of an unabated infestation, Sierka and Bare determined that their apartment was uninhabitable and that their only recourse was to terminate their lease agreement.

123. On March 24, 2025, Sierka and Bare provided written notice to the Management Company via email of their intent to terminate their lease.

124. Finally, for the very first time on April 1, 2025, Management replied through their attorneys.

125. In a breathtaking act of legal posturing and bullying, Defendants asserted that Sierka and Bare were still fully bound by their lease and threatened to enforce it accordingly.

126. After Sierka and Bare moved out of the Building, Defendants retained and have refused despite multiple demands to return their security deposit.

## CLASS ACTION ALLEGATIONS

127. Plaintiffs bring this action individually and on behalf of a class of all tenants and former tenants of the Building from November 1, 2020 to present.

128. Plaintiffs bring this action pursuant to Rule 23(a) and Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated (the "Class").

129. The Class is defined as:

a. All persons who, at any time during the period beginning six years prior to the filing of this Complaint through the date of judgment, leased or rented a residential apartment at 160 Front Street, New York, New York 10038, and were subjected to the conditions, practices, or conduct alleged herein.

b. Excluded from the Class are Defendants, their officers and employees, such as superintendents who may have also resided at the Building.

130. Numerosity (Rule 23(a)(1)): The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the Building contains 63 residential units, and hundreds of individuals have resided there during the relevant period. The precise number of Class members is known to Defendants and can be ascertained through their records.

131. Commonality (Rule 23(a)(2)): Questions of law and fact are common to all Class members and predominate over any questions affecting only individual tenants. Common issues include, without limitation:

a. whether Defendants failed to maintain habitable and safe housing conditions;

b. whether Defendants engaged in systemic harassment, retaliation, and deceptive rent-collection practices;

c. whether Defendants engaged in sexual harassment and sex based discrimination;

d. whether Defendants unlawfully retained or misused tenant security deposits;

e. whether Defendants misappropriated tenant funds designated for safety improvements such as surveillance cameras;

f. whether Defendants' conduct violated the Fair Housing Act, the Fair Debt Collection Practices Act, and the Racketeer Influenced and Corrupt Organizations Act; and

g. the nature and measure of damages and equitable relief appropriate for the Class.

132. Typicality (Rule 23(a)(3)): Plaintiffs' claims are typical of the claims of other Class members because they arise from the same course of conduct by Defendants—namely, the mismanagement, neglect, fraudulent rent collection, and intimidation directed at tenants of the Building—and are based on the same legal theories.

133. Adequacy (Rule 23(a)(4)): Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are coextensive with those of the other Class members, and Plaintiffs have retained counsel experienced in housing, consumer-protection, and class-action litigation.

134. Predominance and Superiority (Rule 23(b)(3)): Common questions of law and fact predominate over individual issues, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Class treatment will promote judicial economy, avoid inconsistent results, and permit the efficient resolution of common claims arising from Defendants' uniform policies and practices.

135. Injunctive and Declaratory Relief (Rule 23(b)(2)): Defendants have acted or refused to act on grounds generally applicable to the Class by maintaining unsafe, unsanitary,

and discriminatory housing conditions, engaging in deceptive rent collection, and misappropriating tenant funds. Final injunctive and declaratory relief is therefore appropriate respecting the Class as a whole.

136. Plaintiffs seek certification of the Class for all causes of action asserted herein, appointment of Plaintiffs as Class Representatives, and appointment of DGW Kramer LLP as Class Counsel under Rule 23(g).

137. At all relevant times, Defendants had a non-delegable duty to maintain the Building in a safe, sanitary, and habitable condition, in full compliance with the New York City Housing Maintenance Code, the New York State Multiple Dwelling Law, and all applicable health and safety regulations, and to comply with the laws of the United States, including the Fair Housing Act, 42 U.S.C. §§ 3601–3617 and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. Defendants' obligations included maintaining adequate sanitation, ensuring the structural soundness of the premises, providing secure access to tenants, not sexually harassing tenants or make repairs contingent on quid pro quo exchange of sexual services, and to collect rents duly and justly owed without making false representations and seeking to collect not owed due to the unsafe and unsanitary conditions of the Building.

## GARBAGE

138. Defendants employed Adnan Hoti as the Building's superintendent from the date of Plaintiff Yagecic's move-in until his termination on or about June 7, 2024, during which period he was responsible for the Building's maintenance and sanitation.

139. During this period, the accumulation of garbage within the Building reached its most egregious levels, creating conditions that were unsanitary, malodorous, and wholly inconsistent with habitability.

140. The garbage area in the basement was repeatedly and continuously filled with waist-high piles of uncollected refuse, causing the garbage chute system to become completely obstructed.

141. As a result of this obstruction, the Building's waste-disposal system became saturated with decomposing refuse, which attracted infestations of rats, cockroaches, and water bugs. Tenants routinely observed such vermin emerging from garbage chutes and traversing common areas and apartments.

142. The accumulation was also accompanied by a pervasive odor of garbage—this was at its most acute on the ground floor and in the basement, naturally, but when the garbage chute backlog was particularly severe, this phenomenon became a communal affair.

143. These unsanitary conditions routinely persisted for weeks at a time before Superintendent Hoti undertook to remove the accumulated garbage. Nevertheless, the accumulation, infestation, and odors recurred with regularity, as the garbage was not removed or disposed of on any consistent schedule.

144. Despite repeated tenant complaints, numerous calls to 311, and direct written notices to the Defendants and their agents, the conditions above persisted for several years, in violation of the New York City Housing Maintenance Code and the Multiple Dwelling Law.

145. Although the Building's garbage conditions have improved following Mr. Hoti's termination in June 2024, Defendants have taken no steps to remediate the damage, infestation, or loss of habitability suffered by tenants during the preceding years.

146. Defendants lacked and failed to implement a written sanitation plan suited to the Building's volume; collection frequency and staffing were inadequate, receptacles were left uncovered, and chute rooms were not regularly washed or disinfected, leading to rapid

re-accumulation following ad hoc clean-ups.

147. Chute doors failed to close or seal, liners were broken or missing, and refuse adhered to surfaces and decayed, producing liquid seepage and mold-like growth during peak periods.

148. The foregoing conditions materially interfered with tenants' health, safety, and use and enjoyment of their homes, diminished rental value, and caused out-of-pocket mitigation costs (odor-control products, sealed bins, air purifiers) and property damage (contaminated items stored near chute rooms and hallways).

149. Defendants had actual and constructive notice of these conditions through tenant complaints and 311 reports, daily observation by staff assigned to the basement and common areas, and the obvious visibility of accumulations and odors.

150. The garbage conditions directly fueled and sustained the Building's rat infestation by providing habitual food sources and harborage; Defendants failed to adopt durable preventative measures—such as increased pickups, sealed containers with lids, daily wipe-downs, and weekend coverage—to prevent immediate recurrence.

**RODENTS (MICE AND RATS)**

151. Due to the unsanitary conditions described in the foregoing paragraphs, tenants of the Building have been periodically subject to vermin in both common areas and individual units which Defendants have not remedied despite multiple requests.

152. From at least 2023 through 2024, the Building experienced a pervasive rat infestation affecting apartments and common areas on multiple floors.

153. However in 2025, the vermin infestation problem escalated to a previously unrecognizable level, seriously affecting multiple floors of the building. Tenants repeatedly

observed fresh droppings in kitchens and bathrooms; gnawed food packaging; traps disturbed overnight; and audible rat activity within walls and ceilings. Sightings of live rats inside apartments were reported, including within pantries and under kitchen sinks

154. The infestation was not confined to isolated units. Tenants on lower, middle, and upper floors reported the same conditions within overlapping timeframes, and common areas—including the basement refuse room, chute rooms, and stairwells—showed signs of active harborage (droppings, rub marks, nesting material), demonstrating building-wide conditions rather than unit-specific sanitation issues.

155. Structural deficiencies contributed to the infestation: unsealed pipe penetrations under kitchen and bathroom sinks; gaps around radiator risers; holes behind appliances and along baseboards; and compromised chute-room doors. In several apartments, plaster "patches" were chewed through within days, and temporary foam sealant was ineffective.

156. Individual tenant's best efforts to remediate the situation proved ineffective as tenants were informed that the issue was building wide and structural and it was beyond the ability of any tenant to prevent the repeated rat infestations from invading their apartments.

157. Defendants failed to implement a lawful integrated pest-management (IPM) program. Extermination efforts were sporadic, reactive, and limited to bait placement without coordinated inspection, sealing of entry points, sanitation improvements, and follow-up. Vendor visits were undocumented or infrequent; no building-wide sealing campaign occurred; and work orders did not reflect systematic abatement.

158. Garbage accumulations and recurring chute blockages exacerbated the infestation by providing food sources and harborage. Periodic cleanups, when they occurred, were followed by renewed accumulations, and Defendants did not adopt durable practices (e.g., increased

collection frequency, sealed containers, and cleaning protocols) to prevent recurrence.

159. Multiple tenants submitted written complaints to Management and made 311 reports when conditions were acute. Defendants had actual and constructive notice of the infestation through these complaints, visible conditions in common areas, and vendor entries, yet failed to undertake sustained corrective measures.

160. In or about February and March 2025, conditions escalated in the apartment (Sierka/Bare), where tenants documented droppings, gnawed packaging, and live rats in the kitchen; a patch applied by staff was chewed through within a day.

161. The infestation caused health and safety risks—including exposure to rodent allergens and pathogens—loss of use and enjoyment of apartments, contamination of foodstuffs and cookware, the need to discard personal property, and costs for private pest-control measures and sealing supplies.

162. On or about March 27, 2025, the Management Company engaged in a one time extermination attempt and engaged a company to drill holes in each apartment and insert rat poison within the walls. This method of remediation left numerous rat carcasses decomposing within the walls, creating a pervasive odor of decay and a new unsanitary condition, which the Management Company declined to further remediate.

163. Furthermore, this one time engagement of an exterminator failed to create sustained or meaningful decline in the pest/vermin problem, and after a short period of time, the infestation returned, and tenants continue to report hearing rats within the walls and ceilings of the Building as of the date of this filing.

164. The foregoing facts establish a building-wide rat infestation that persisted and recurred due to Defendants' failure to implement effective, sustained IPM measures and to

remedy contributing sanitation and structural conditions.

**FRONT DOOR SECURITY**

165. Due to the Management Company's inability to secure the front door of the Building, the tenants have been deprived of a sense of security in their own home.

166. For a prolonged period during the class period, the Building's primary entrance door failed to self-close and latch reliably. Tenants could open the door with minimal force or by sliding a card along the jamb, and the latch and closer routinely went out of adjustment. The defect allowed unauthorized persons to enter the Building without a key or buzzer access.

167. Lobby CCTV cameras were inoperative for extended stretches, leaving no effective video monitoring of the entrance or package area. When partial service existed, cameras lacked coverage of key angles or had no video retention, rendering footage useless for identifying intruders or theft incidents.

168. The lack of operative cameras is especially egregious because previous tenants paid for the installation of security cameras with those payments having been made to Defendants which Defendants misappropriated and kept for themselves instead of spending on camera installation.

169. Numerous apartments lacked functional intercom/buzzer systems, preventing residents from screening visitors and compounding the risk created by the faulty front door. Tenants reported that buzzers rang intermittently, failed to unlock the door, or were entirely dead for months at a time. The lack of functional intercom/buzzer systems made it impossible for tenants to ascertain who was at the door because of the inability to communicate through the system.

170. As a result of these failures, tenants experienced repeated package thefts,

suspicious loitering in stairwells and hallways, and unauthorized entries into common areas. Police and delivery complaints were made, and tenants altered routines (e.g., avoiding evening returns alone, rerouting packages, or purchasing private locks/cameras) to mitigate risk.

171. Defendants had actual and constructive notice of the security defects through tenant emails, work-order requests, visible front-door malfunctions observable to staff, and the prolonged outage of lobby cameras and unit buzzers. Despite this notice, Defendants undertook only short-term fixes (periodic latch adjustments or temporary camera resets) without durable replacement or maintenance protocols, allowing the conditions to recur.

172. The front-door, CCTV, and intercom failures violated applicable code and industry-standard practices for multi-family buildings and created conditions dangerous to life, health, and safety. These failures materially interfered with tenants' use and enjoyment and diminished the rental value of their apartments.

173. To this day, it remains possible for people to simply walk into the building, without needing to unlock the front door.

## HARASSMENT AND RETALIATION BY BUILDING STAFF

174. Throughout the class period, tenants of the Building were subjected to harassment, intimidation, and retaliation by Defendants' employees and agents, including the superintendents Adnan and Benny.

175. Defendants' agents routinely responded to good-faith tenant complaints about uninhabitable conditions with hostility and verbal abuse, rather than assistance. Tenants who contacted 311 or otherwise exercised their rights were often met with retaliation, threats, or derision.

176. Adnan, who served as superintendent until June 2024, created a pervasive

atmosphere of intimidation, particularly toward female tenants. Multiple residents—including Plaintiffs Sierka and Bare—reported that Adnan engaged in unwanted and inappropriate conduct, including loitering in their apartments without legitimate work purpose, smoking on their balconies, requesting alcohol while on duty.

177. Adnan also made sexual advances on female tenants, including quid pro quo comments suggesting that repairs for certain female tenants would only occur if they socialized with him, and he made similar insinuations to other young women in the Building. Adnan also made calls to female tenants in the middle of the night—at hours when tenants would ordinarily be in bed, undressed, or preparing for sleep—which made the timing itself intrusive and laden with inappropriate implication. The context suggested an intent to invade the Plaintiffs' personal and private space and to elicit a sense of vulnerability, reinforcing the sexualized undertone of Adnan's behavior, and making female residents feel unsafe in their own homes.

178. These statements, combined with his unpredictable behavior and aggressive demeanor, caused fear and discomfort among tenants and created a hostile living environment.

179. Adnan's misconduct was not isolated to harassment. He routinely berated tenants for reporting code violations, accused them of causing the Building's unsanitary conditions, and explicitly blamed residents for management's own neglect. Defendants took no meaningful steps to discipline or remove Adnan until after years of tenant complaints, even after his arrest for driving under the influence while in possession of a loaded firearm and threatening to "kill everyone there," as publicly reported in December 2022.

180. After Adnan's departure, his successor, Benny, perpetuated the same pattern of hostility and intimidation. Tenants who reported safety issues, heating failures, or leaks were met with verbal aggression and sarcasm, including statements such as, "What do you want me to

do—kill myself?" Benny frequently dismissed safety concerns, refused to acknowledge emergencies, and denied obvious hazards, including the October 2024 boiler incident that required Fire Department intervention.

181. Tenants who made complaints to management or city agencies reported that they were thereafter ignored, confronted with threats of eviction, or accused of fabricating issues. Defendants' pattern of retaliation, harassment, and indifference to tenant safety constituted a continuing violation of tenants' rights under New York law and materially interfered with their use and enjoyment of their homes.

182. All of the Superintendents at the building have repeatedly used "I know you called 311" as an intimidation tactic in clear violation of tenants' right to file complaints and as part of their harassment campaign to discourage and dissuade tenants from having their grievances investigated.

**WATER LEAKS AND STRUCTURAL DECAY**

183. Defendants also permitted severe and ongoing water intrusion, leaks, and structural deterioration throughout the Building, creating unsafe and unsanitary living conditions and potential mold contamination.

184. Tenants across multiple floors have reported leaks from ceilings, walls, and bathroom fixtures since at least 2022. Water infiltration was observed in the lobby, stairwells, and occupied apartments. Rather than identifying and repairing the underlying causes, Defendants performed superficial "patch" work that failed to stop the leaks or prevent recurrences.

185. In or about early 2022, the bathroom ceiling of the apartment (Sierka/Bare) collapsed entirely after months of complaints to superintendent Adnan Hoti. Plaintiffs were

forced to use another vacant unit's bathroom for weeks while Defendants performed only minimal cosmetic repairs. Similar ceiling failures occurred in other units during the same period, displacing tenants for extended durations.

186. On April 1, 2025, severe leaks from Unit 3F's bathroom caused water to pour through the lobby ceiling, forming large puddles. Tenants, including Plaintiff Yagecic, placed buckets to catch the dripping water while management and maintenance staff failed to respond. The superintendent was on vacation, his replacement unreachable, and management ignored multiple written reports.

187. The leaks persisted for weeks, contributing to mold growth and worsening air quality. Multiple tenants reported respiratory symptoms consistent with mold exposure, yet Defendants failed to perform air testing, remediation, or disclosure as required under applicable codes and best practices.

188. The standing water also contributes to the pest problem by creating an ideal environment for the proliferation of mosquitos, horse-flies, water bugs, and providing water access for rodents and roaches.

189. These water and structural conditions were visible, recurrent, and widely reported to management and city authorities, providing Defendants with actual and constructive notice. Despite this, Defendants refused to engage qualified contractors to perform durable remediation or investigate systemic failures in plumbing or roof drainage.

**HEAT AND BOILER FAILURES**

190. Defendants also failed to maintain the Building's heating systems in safe and lawful operating condition, resulting in prolonged overheating, boiler malfunctions, and unstable indoor temperatures that endangered tenants' health and safety.

191. During multiple heating seasons from 2021 through 2025, tenants experienced extreme and erratic indoor temperatures. Apartments routinely reached temperatures exceeding 90°F to 100°F, even with radiator valves fully closed, while other apartments were left without adequate heat for extended periods. These conditions violated the New York City Housing Maintenance Code, which mandates minimum and maximum temperature thresholds during heating season.

192. The Building's central boiler system was the source of repeated failures and safety hazards. On or about October 11, 2024, the basement water boiler overheated and began emitting violent banging noises audible throughout the lobby and first-floor corridors. The noise and heat were so severe that tenants described it as "sounding like it was going to explode." The New York City Fire Department was called to the scene and forced to shut the boiler down due to the imminent safety risk.

193. Even after that intervention, the boiler continued to malfunction. Tenants reported that the lobby and hallways became oppressively hot—described by residents as "hotter than a sauna"—and heat radiated through floors and walls, making some apartments unlivable. The heat persisted even after radiator valves were closed, and Defendants' staff provided no explanation or remediation.

194. The superintendent, Benny, routinely denied that any issue existed, even as temperatures inside apartments reached dangerous levels. Tenants' written complaints to management went unanswered, and no professional inspection or calibration of the boiler system was conducted.

195. These conditions created substantial health risks for elderly and medically vulnerable tenants, as well as damage to personal property from heat exposure. In some

instances, hot water and radiator pipes radiated through kitchen floors and walls, creating a burn hazard and warping flooring materials.

196. The kitchen floors and walls were sometimes so hot that they were painful to make contact. The impact is especially compounded with the issue of defective locks that could trap residents inside their own apartments and the corresponding potential fire hazard.

197. The heating failures were systemic, affecting multiple units and common areas simultaneously. Defendants' refusal to properly maintain and calibrate the boiler system, or to employ qualified HVAC technicians, reflected a pattern of reckless indifference to tenant safety.

**FAILURE TO PROVIDE ESSENTIAL SERVICES AND COMMUNICATION**

198. Throughout the class period, Defendants failed to provide and maintain essential services necessary for lawful habitation, and failed to establish any functional system of communication or responsiveness to tenant complaints.

199. Defendants routinely ignored or delayed responses to tenant reports of hazardous conditions—including vermin infestations, heating failures, water leaks, and security defects—leaving tenants without assistance or recourse for prolonged periods.

200. Tenants repeatedly emailed, texted, and called Defendants' management office, only for messages to go unanswered or be redirected to unmonitored voicemail inboxes. On many occasions, tenants received no acknowledgment of their reports, forcing them to make multiple follow-ups or file 311 complaints simply to obtain basic maintenance.

201. The Building lacked clear signage identifying the superintendent or emergency contact, in violation of legal requirements under the New York City Housing Maintenance Code. Tenants were therefore often unable to determine who was on duty, how to reach building staff, or whom to contact in emergencies.

202. Management's failure to communicate extended to emergencies involving health and safety. During the October 2024 boiler crisis, tenants sent numerous emails and calls reporting dangerously high temperatures and loud banging noises, but received no response until the Fire Department intervened. Similarly, during episodes of severe flooding and water leakage, management failed to answer or return calls for days, leaving tenants to mitigate damage themselves.

203. The Building's intercom and buzzer systems—another essential service—were inoperative for extended periods, preventing tenants from safely admitting guests, delivery personnel, or emergency responders. Defendants' failure to maintain these systems not only undermined security but also effectively cut tenants off from the outside world, particularly elderly and disabled residents who could not descend to the lobby.

204. Tenants who escalated complaints to city agencies, including the Department of Housing Preservation and Development ("HPD") and 311, were often met with retaliation or hostility from Defendants' staff. Reports include verbal confrontations, dismissive or mocking comments, and threats of eviction or reprisal.

205. Defendants' chronic unresponsiveness was not accidental but systematic. The Management Company operated without adequate staffing, oversight, or tracking of tenant requests, and superintendents were given unchecked discretion to ignore, delay, or deny repairs. Complaints were rarely documented, and no accessible or transparent reporting process was maintained for tenants.

206. As a result, tenants endured extended periods without essential services—heat, sanitation, pest control, intercom access, and emergency communication—rendering their homes unfit for occupancy.

## SECURITY DEPOSIT RETURNS

207. Throughout the class period, Defendants engaged in a uniform practice of withholding residential security deposits after tenants vacated without providing a timely, itemized statement of claimed damages and without returning the remaining balance within fourteen (14) days. Former tenants routinely received no itemization at all, or one delivered weeks or months late, often after multiple written demands.

208. The Building contains more than six units. Defendants did not consistently place deposits in a separate interest-bearing account at a New York banking organization, did not disclose the bank name and address to tenants, and did not pay or credit annual interest as required. Upon information and belief, Defendants commingled tenant deposits with operating funds and used them for ordinary expenses.

209. Defendants failed to offer or conduct pre-vacatur inspections within the statutory window and did not provide contemporaneous written statements specifying conditions to be cured before move-out. Instead, Defendants routinely asserted post-hoc charges—such as repainting, ordinary cleaning, or replacement of fixtures subject to normal wear and tear—that are not lawful bases to withhold deposits.

210. In many instances, Defendants conditioned any return of deposit funds on tenants executing releases, accepting unlawful deductions, or withdrawing complaints. Tenants who disputed deductions were directed to collection personnel rather than a good-faith accounting, further delaying the return of their property.

211. Plaintiffs Sierka and Bare vacated their apartment in the Building in March 2025 after giving written notice. Defendants failed to provide a compliant itemized statement within fourteen (14) days and did not return their security deposit within that period, despite multiple

written demands. Defendants' retention of their deposit forms part of a broader pattern affecting multiple tenants during the class period.

212. Defendants' deposit practices were willful and systematic rather than inadvertent: the same failures recurred across departing tenants; communications show knowledge of the fourteen-day requirement; and Defendants nevertheless delayed or refused to return deposits, sought to impose charges for normal wear and tear, and withheld deposits as leverage in disputes arising from the Building's uninhabitable conditions.

## DEBT COLLECTION PRACTICES

213. Throughout the class period, Defendants 160 Front Street Associates LLC, Samson Management LLC, and Samson Funding Corporation engaged in an organized and systematic campaign to extract rent, fees, and purported arrears from tenants and former tenants through deceptive, coercive, and unlawful debt-collection practices. These practices continued even after Defendants had actual knowledge that the Building was uninhabitable and in flagrant violation of the New York City Housing Maintenance Code, Multiple Dwelling Law, and Real Property Law § 235-b.

214. Defendants, acting through the Management Company and outside collection agencies, regularly issued demand letters and threatened legal action against tenants who withheld rent in protest of vermin infestations, security failures, and collapsed ceilings.

215. For Sierka and Bare, the harassment did not end after they vacated their apartment in March 2025. Despite providing written notice of constructive eviction and demanding return of their security deposit, Defendants not only refused to return those funds but also referred their account to a debt-collection agency retained by the Management Company and/or the Owner.

216. In September 2025, Defendants knowingly mailed a fraudulent debt notice

seeking to collect thousands of dollars in rent from Sierka and Bare.

217. These collection efforts were fraudulent and retaliatory. Defendants knew that Sierka and Bare were legally relieved of their rental obligations due to constructive eviction due to an out of control pest issue and other conditions as detailed at length above.

218. Defendants' misconduct was not limited to these Plaintiffs. The Owner and the Management Company have routinely mailed out documents including rent demands asserting full rent due despite actual knowledge that the premises were uninhabitable and that tenants were legally relieved of rent obligations. These demands were intended to deceive tenants into paying sums not owed, and were transmitted through the U.S. Mail in furtherance of Defendants' ongoing scheme to defraud, and took place over the course of years.

219. For instance, in October 2020, Defendants so served a 14 Day Notice, including transmission of such notice through U.S. Mail, seeking rents despite actual knowledge that the premises were uninhabitable to former tenants Andrean Noir and Eric Noir who lived in Apartment 6A of the Building.

220. For instance, in October 2020, Defendants so served a 14 Day Notice, including transmission of such notice through U.S. Mail, seeking rents despite actual knowledge that the premises were uninhabitable to former tenant Stephanie Jainarine who lived in Apartment 7A of the Building.

221. For instance, in March 2021, Defendants so served a 14 Day Notice, including transmission of such notice through U.S. Mail, seeking rents despite actual knowledge that the premises were uninhabitable to former tenant Justin Starrantino who lived in Apartment 4H of the Building.

222. For instance, in February 2023, Defendants so served a 14 Day Notice, including

transmission of such notice through U.S. Mail, seeking rents despite actual knowledge that the premises were uninhabitable to former tenants Barnabas Miller and Heidi Miller who lived in Apartment 4J of the Building.

223. For instance, in May 2023, Defendants so served a 14 Day Notice, including transmission of such notice through U.S. Mail, seeking rents despite actual knowledge that the premises were uninhabitable to former tenant Watson Brown who lived in Apartment 5G of the Building.

224. These are a few of a multitude of examples where Defendants served and transmitted through mail rent demands which they knew to be false because those rent demands did not take into account the uninhabitability and the conditions of the Building despite actual knowledge through multiple complaints by tenants as to these conditions, and because Defendants' staff who live and work in the Building had personally witnessed these conditions and tenant complaints.

225. Each mailing, email, or debt-collection communication was in furtherance of a scheme by Defendants to extract rental payments that Defendants knew they were not legally entitled to because of the conditions at the Building. These communications were made continuously by the Owner and the Management Company for the purposes of victimizing Plaintiffs and the Class, and took place repeatedly over the course of multiple years as demonstrated above.

## RELATIONSHIP BETWEEN DEFENDANTS

226. The Building is owned by Owner and managed by the Management Company, with financing provided by the Lender.

227. The Owner, Management Company, and Lender are an association-in-fact that

operate together as an enterprise for the common purpose of extracting unlawful rental income from the tenants of the Building.

228. Upon information and belief, these entities are affiliates of one another with common ownership.

229. Upon information and belief, Owner has its offices at the same location as the Management Company and utilizes the same employees as the Management Company. Owner does not have its own independent offices or employees.

230. This is because public documents show that all mail and correspondence for the Owner appears to be made in care of the Management Company, suggesting that the Owner does not have its own offices or employees to accept or receive communications.

231. In addition, in public filings, including Landlord and Tenant petitions filed on behalf of Owner, all list Owner's address as 118-35 Queens Blvd., Suite 1710, Forest Hills, NY 11375 which is the same address as maintained by the Management Company.

232. Upon information and belief, the Lender is also an affiliate of the Management Company, sharing common ownership.

233. This is because registration records maintained with the Department of State shows that the Lender accepts service of papers through the Management Company.

234. This is also because public documents from 2015 show that mail and correspondence for the Lender also appear to be made in care of the Management Company at their prior address of 97-77 Queens Blvd., suggesting that the Lender does not have its own separate and independent offices.

235. Upon information and belief, a substantial percentage of the revenue generated by the Owner including tenant rental income and security deposits, have been diverted to the

Lender.

236. The domination of the Owner and Management Company by the Lender has left the Owner and Management Company undercapitalized and without adequate financial resources in order to provide the necessary and proper maintenance of the Building.

237. The domination of the Owner and the Management Company by the Lender has resulted in harm to Plaintiffs and the Class for all the reasons mentioned above.

238. For these reasons, the corporate veil should be pierced as to the Lender.

239. The domination of the Owner by the Management Company has allowed the Management Company to mismanage the Building without consequences including termination and removal and replacement with a management company that is more attentive to the needs of the tenants of the Building.

240. The domination of the Owner by the Management Company has resulted in harm to Plaintiffs and the Class for all the reasons mentioned above.

241. For these reasons, the corporate veil should be pierced as to the Owner.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION –

## BREACH OF THE IMPLIED WARRANTY OF HABITABILITY

242. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

243. Plaintiffs and the Class are residential tenants of the Building under written leases subject to Real Property Law § 235-b, which implies a non-waivable warranty that the premises and common areas are fit for human habitation and free of conditions dangerous to life, health, or safety and that services essential to habitability will be maintained.

244. Defendants, as Owner and Manager (and their agents), were obligated to provide and maintain habitable conditions, including adequate sanitation, extermination, building security (functional entrance door, intercom/buzzer, and CCTV), and compliance with applicable codes and laws.

245. During the Class Period, Defendants breached the warranty by permitting conditions dangerous to life, health, and safety to persist and recur, including but not limited to: (a) chronic accumulations of rotting garbage and chute blockages producing pervasive odors; (b) a building-wide rat infestation with droppings, gnawed food packaging, rats entering apartments and walls, and decomposing carcasses; (c) security failures including a front door that failed to latch and could be opened with a credit card, nonfunctional lobby cameras, and broken intercom/buzzer systems that left tenants exposed to intrusions and theft, (d) subjecting female tenants to harassment in their own homes, and (e) multiple other miscellaneous hazardous and unsafe conditions relating to leaks, collapses, malfunctioning boilers, mold and other issues as outlined in detail above.

246. Plaintiffs and Class members provided Defendants with actual and constructive notice of the foregoing conditions by repeated complaints, emails, calls, written notices, and 311 reports; the conditions were also open and notorious in common areas. Notwithstanding notice, Defendants failed to implement sustained and effective remediation and allowed the conditions to recur.

247. As a direct and proximate result of Defendants' breaches, Plaintiffs and Class members suffered damages, including diminished rental value (warranting substantial rent abatements), loss of use and enjoyment of their homes, out-of-pocket expenses (including mitigation and pest-control costs), property loss and damage, and other consequential harms.

248. The breaches alleged herein were continuous and recurrent.

249. Any purported waiver of the warranty is void as against public policy. Plaintiffs and Class members did not cause or consent to the complained-of conditions, and any alleged failure to provide access or similar pretext is denied; to the extent access was coordinated, Defendants' efforts were tardy, sporadic, and ineffective.

250. Plaintiffs seek a judicial declaration that Defendants breached the implied warranty of habitability and an award of rent abatements for future rents, an award of rent abatement for refunds of rent paid previously during periods of uninhabitable conditions, compensatory damages, pre- and post-judgment interest, attorney's fees, costs, and such further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION – BREACH OF COVENANT OF QUIET ENJOYMENT

251. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

252. Each lease between Plaintiffs or the Class, and Defendants contains an express and/or implied covenant of quiet enjoyment under New York law, guaranteeing tenants the right to use and enjoy their apartments without substantial interference by the landlord or its agents.

253. Defendants substantially and unreasonably interfered with Plaintiffs' use and enjoyment by permitting and causing pervasive vermin infestations, chronic garbage accumulations with no durable abatement program, and prolonged security failures, including a front door that failed to latch, inoperable lobby cameras, and nonfunctioning intercom/buzzer systems, notwithstanding repeated notice, harassment against female tenants in relationship to their sex, and multiple other miscellaneous hazardous and unsafe conditions relating to leaks, collapses, malfunctioning boilers, mold and other issues as outlined in detail above

254. As a result of Defendants' conduct, Plaintiffs who remain in possession suffered loss of use and enjoyment, diminished rental value, and out-of-pocket mitigation costs. Plaintiffs seek damages and, where appropriate, declaratory and injunctive relief to halt and prevent further interference and to restore lawful conditions.

255. Any purported waiver of the covenant is void as against public policy. Plaintiffs did not cause or consent to the complained-of conditions.

256. Plaintiffs seek damages on behalf of themselves and the Class for rent abatements for future rents and refund for rents already paid, and all other relief available for Defendants' breach of the covenant of quiet enjoyment including attorney's fees.

**THIRD CAUSE OF ACTION — CONSTRUCTIVE EVICTION**

257. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

258. Defendants' wrongful acts and omissions, including pervasive vermin, chronic garbage accumulations, and sustained building-security failures, substantially and materially deprived Plaintiffs Sierka and Bare of the beneficial use of their apartment, rendering it uninhabitable and unsafe.

259. Sierka and Bare provided notice to Defendants and vacated the apartment within a reasonable time in March 2025. Their departure was a direct and foreseeable result of Defendants' conduct.

260. Sierka and Bare seek damages available for constructive eviction, including return of rent paid for periods of uninhabitability, moving and relocation costs, alternative housing expenses, property loss, the return of their security deposit, and consequential damages proximately caused by the constructive eviction.

261. To the extent necessary, Plaintiffs plead in the alternative a partial actual eviction theory for periods during which essential services and conditions made portions of the premises unusable.

262. Plaintiffs also seek declaratory and injunctive relief to prevent recurrence of the conditions that led to constructive eviction and to ensure lawful management of the Building.

263. Plaintiffs seek damages on behalf of themselves and the Class of all tenants who have been similarly constructively evicted as a consequence of the uninhabitable conditions of the Building.

**FOURTH CAUSE OF ACTION — NEGLIGENCE**

264. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

265. Defendants owed Plaintiffs and the Class a duty to exercise reasonable care in operating, maintaining, repairing, and securing the Building, its common areas, and building systems, and to comply with applicable statutes and regulations, including but not limited to the NYC Housing Maintenance Code and the Multiple Dwelling Law.

266. Defendants breached their duties by, among other things: (a) failing to implement and maintain adequate sanitation practices, allowing chronic garbage accumulations and chute blockages; (b) failing to institute and sustain an effective integrated pest-management program to prevent and abate a rat infestation; (c) failing to repair and maintain building security systems, including a properly latching front door, functional CCTV, and working intercom/buzzer systems; (d) ignoring or unreasonably delaying responses to tenant complaints and 311 notices, (e) subjecting female tenants to harassment in their own homes, and (f) multiple other miscellaneous hazardous and unsafe conditions relating to leaks, collapses, malfunctioning

boilers, mold and other issues as outlined in detail above.

267. Defendants' violations of the Housing Maintenance Code and Multiple Dwelling Law also breached their duty as it constitutes negligence per se in that the statutes were designed to protect tenants from the very harms suffered here—unsafe, unsanitary, and insecure living conditions—and Plaintiffs and the Class are within the protected class of residential occupants.

268. Defendants violated numerous provisions of the New York City Housing Maintenance Code, including but not limited to: N.Y.C. Admin. Code § 27-2005 (owner's duty to maintain building in good repair); § 27-2011 (sanitation requirements); § 27-2017 (extermination of pests); § 27-2041 (entrance door locks and security).

269. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class members suffered injuries and damages, including diminished rental value, loss of use and enjoyment, property damage and loss (including from vermin and unauthorized intrusions), out-of-pocket mitigation costs (e.g., pest-control supplies, private exterminators, sealing materials), and emotional distress associated with unsafe and unsanitary conditions.

270. The negligent conduct alleged herein was continuous and recurrent throughout the Class Period. Plaintiffs seek classwide compensatory damages, applicable statutory penalties, pre- and post-judgment interest, costs, and injunctive relief requiring Defendants to implement and maintain lawful sanitation, extermination, and security measures.

**FIFTH CAUSE OF ACTION — GROSS NEGLIGENCE**

271. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

272. Defendants' conduct rose to the level of gross negligence in that it reflected a reckless indifference to, and conscious disregard for, tenants' health and safety. For years,

despite repeated tenant complaints, visible conditions, and 311 notices, Defendants failed to implement any durable sanitation, extermination, or security program, allowing dangerous conditions to persist and recur building-wide.

273. Defendants knowingly prioritized cost-cutting and rent collection over basic code compliance and habitability, including by permitting chronic garbage accumulations, a rat infestation, and prolonged entrance-door, CCTV, and intercom failures that foreseeably exposed tenants to vermin, stench, intrusion, theft, and fear.

274. The risks created by Defendants were substantially greater than ordinary negligence; Defendants were repeatedly apprised of those risks yet chose inaction or superficial, short-lived measures. Such conduct evidences willful and wanton disregard for tenant safety.

275. As a direct and proximate result, Plaintiffs and Class members sustained damages including rent abatements for future and past rents paid, property loss and damage, out-of-pocket mitigation expenses, and loss of use and enjoyment.

276. Punitive damages are warranted to punish and deter Defendants' willful and wanton misconduct and to protect the public from similar conduct in the operation and management of multi-family residential buildings.

## SIXTH CAUSE OF ACTION — NEGLIGENT HIRING AND SUPERVISION

277. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

278. Defendants owed Plaintiffs and the Class a duty to exercise reasonable care in hiring, supervising, and retaining employees and agents entrusted with the operation, maintenance, and safety of the Building, including but not limited to superintendents Adnan and Benny.

279. Defendants breached that duty by employing, retaining, and failing to adequately supervise individuals who were manifestly unfit and unqualified for positions of trust, responsibility, and tenant contact, despite knowledge—or clear constructive knowledge—of their unfitness.

280. For years, Adnan served as the Building's superintendent and was responsible for maintenance, repairs, sanitation, and tenant relations. During his employment, Adnan engaged in repeated acts of misconduct, including sexual harassment, verbal abuse, and intimidation of tenants, particularly female residents. He entered apartments without legitimate work purpose, lingered in tenant spaces, made inappropriate personal comments, requested alcohol while on duty, and placed late-night phone calls to female tenants with inappropriate requests.

281. Adnan also displayed aggressive and hostile behavior toward tenants who lodged complaints about unsafe or unsanitary conditions, including yelling at and blaming tenants for management's failures. Despite numerous tenant complaints and clear evidence of unprofessional and threatening conduct, Defendants failed to take any meaningful corrective or disciplinary action.

282. Defendants further ignored publicly available information evidencing Adnan's unfitness. As reported in a December 2022 *Staten Island Live* article, Adnan was arrested for driving under the influence while in possession of a loaded firearm and threatening to "kill everyone there." This incident occurred during his tenure as superintendent and was publicly known, yet Defendants continued to employ him in a role requiring judgment, composure, and responsibility for tenants' safety and well-being.

283. Following Adnan's departure, Defendants hired Benny as superintendent without adequate screening or training. Benny likewise displayed hostility and aggression toward tenants

who made lawful complaints, often responding to safety concerns with sarcasm, shouting, or emotional outbursts—including statements such as, *"What do you want me to do—kill myself?"* Despite multiple reports of his unprofessional conduct and failures to respond to emergencies, Defendants retained him without discipline or intervention.

284. Defendants' failure to conduct reasonable background checks, to investigate repeated complaints of harassment and misconduct, or to remove or retrain unfit employees constituted negligent hiring, supervision, and retention. These failures foreseeably resulted in harassment, intimidation, and unsafe conditions within the Building, including the perpetuation of health and safety hazards, retaliatory conduct toward tenants, and emotional distress among residents.

285. Defendants' acts and omissions directly and proximately caused injury to Plaintiffs and Class members, including emotional distress, fear, loss of use and enjoyment of their homes, and exposure to unsafe and unsanitary living conditions.

286. Defendants' conduct was wanton, reckless, and demonstrated a conscious disregard for tenant safety and welfare, warranting an award of compensatory and punitive damages.

**SEVENTH CAUSE OF ACTION — DISCRIMINATION AND HARASSMENT IN HOUSING (N.Y.C. ADMIN. CODE § 8-107)**

287. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

288. At all relevant times, Defendants were "owners," "landlords," and "housing providers" within the meaning of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-102 and 8-107, and were prohibited from discriminating against tenants in the terms,

conditions, or privileges of rental housing, or in the provision of services or facilities, on the basis of gender or any other protected characteristic.

289. Defendants, acting individually and through their agents and employees, including superintendent Adnan Hoti, engaged in and tolerated a pattern of sexual harassment and gender-based discrimination in violation of N.Y.C. Admin. Code §§ 8-107(5), 8-107(6), and 8-107(7), by:

a. Subjecting female tenants, including Sierka and Bare, to sexual harassment and unwanted advances, including entering or lingering in tenants' apartments without legitimate work purpose, making personal and suggestive remarks, requesting alcohol while on duty, and making late-night phone calls at 2–3 a.m. that were intrusive and sexually suggestive in nature;

b. Conditioning or implying that repairs or services would be provided only if female tenants acquiesced to social or romantic interaction, constituting quid pro quo sexual harassment;

c. Providing preferential treatment to female tenants who engaged socially with Adnan, and deprioritizing or ignoring requests by others, including male tenants, thereby discriminating in the terms and conditions of housing;

d. Creating and maintaining a hostile housing environment that was severe, pervasive, and unreasonably interfered with tenants' use and enjoyment of their homes;

e. Failing to take prompt and effective remedial action despite actual and constructive notice of the harassment through tenant complaints and communications; and

f. Retaliating against tenants who complained to management or city agencies by delaying repairs, issuing threats or accusatory statements such as "I know you called 311," and fostering a climate of intimidation and fear.

290. Defendants' conduct was willful, wanton, and undertaken in reckless disregard of Plaintiffs' protected rights. Defendants are vicariously liable for the conduct of their employees and agents under the principles of respondeat superior.

291. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiffs and female Class members suffered emotional distress, humiliation, anxiety, loss of use and enjoyment of their homes, and economic damages, including costs of relocation and mitigation, and male Class members suffered from denial of services.

292. Plaintiffs and the Class seek compensatory and punitive damages, civil penalties, declaratory and injunctive relief requiring Defendants to implement anti-harassment policies and training, and reasonable attorneys' fees and costs pursuant to N.Y.C. Admin. Code § 8-502(g).

## EIGHTH CAUSE OF ACTION — PUBLIC AND PRIVATE NUISANCE

293. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

294. Defendants, through their ownership, operation, and control of the Building, created and maintained a continuing condition that unreasonably interfered with Plaintiffs' and Class members' use and enjoyment of their homes, including chronic garbage accumulations, pervasive vermin, and prolonged failures of entrance security, intercom/buzzer, and CCTV systems.

295. These conditions substantially and unreasonably invaded Plaintiffs' private

property interests by causing noxious odors, unsanitary and unsafe living conditions, noise from vermin activity within walls and ceilings, and increased risk of intrusion and theft. The interference was significant, ongoing, and not a mere inconvenience.

296. The conditions also constitute a public nuisance in that they affected the health, safety, and comfort of a substantial number of residents and visitors within the Building and, on information and belief, imposed burdens on municipal services responding to repeated complaints and violations.

297. Defendants had actual and constructive knowledge of the nuisance conditions and failed to abate them within a reasonable time; instead, the conditions recurred due to inadequate or intermittent measures.

298. Plaintiffs and the Class seek damages for loss of use and enjoyment, property loss and damage, and other consequential harms, and seek abatement and injunctive relief requiring Defendants to eliminate the nuisance conditions and to implement and maintain effective sanitation, extermination, and security protocols.

**NINTH CAUSE OF ACTION — DECEPTIVE ACTS AND PRACTICES**

299. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

300. Defendants engaged in consumer-oriented deceptive acts and practices affecting the public at large, in violation of General Business Law § 349, by, among other things: (a) marketing and representing the Building and its services as safe, sanitary, and properly maintained, including secure entrance, functioning intercom/CCTV, and routine extermination; (b) assuring tenants that complaints would be promptly and effectively addressed; and (c) concealing and omitting material facts about chronic garbage accumulations, a pervasive rat

infestation, and long-standing security failures that were known to Defendants or could have been known through reasonable diligence.

301. Defendants' misrepresentations and omissions were materially misleading to a reasonable consumer and were directed at current and prospective tenants through lease documents, renewal communications, building postings, emails, and verbal assurances by management and staff.

302. As a direct and foreseeable result of Defendants' deceptive acts and practices, Plaintiffs and Class members suffered injury, including paying rent and fees for apartments and services of materially diminished value, incurring out-of-pocket mitigation costs, and entering into or renewing leases they otherwise would not have, or not on the same terms.

303. Plaintiffs and the Class seek actual damages, treble damages up to the statutory cap for willful or knowing violations for named Plaintiffs, reasonable attorneys' fees and costs, and injunctive relief enjoining Defendants from further deceptive practices and requiring corrective disclosures and lawful building operations.

## TENTH CAUSE OF ACTION — FAILURE TO RETURN SECURITY DEPOSITS

304. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

305. Defendants received residential security deposits from Plaintiffs and Class members in connection with leases for apartments in the Building. By statute, such deposits remain the property of the tenant and must be held in trust and returned, less lawful itemized deductions, in accordance with General Obligations Law § 7-108.

306. For buildings with six or more units, landlords must place deposits in a separate interest-bearing account and provide the tenant with the bank's name and address. Regardless of

building size, upon a tenant's vacatur, the landlord must provide a written itemized statement of any claimed damages and return the remaining deposit within fourteen (14) days. Failure to provide the statement within fourteen (14) days results in forfeiture of any right to retain any portion of the deposit.

307. Defendants failed to comply with these statutory duties. On a classwide basis, and specifically as to Plaintiffs Madeline Sierka and Abigail Bare, Defendants did not provide a timely, statutorily compliant itemized statement after vacatur and did not return the security deposit within fourteen (14) days.

308. Defendants' violations caused injury to Plaintiffs and the Class, including the wrongful withholding of funds and loss of statutory interest where applicable.

309. Defendants' have refused to comply with the statute willfully by refusing to return the security deposit despite demand being made for the same.

310. Plaintiffs and the Class seek judgment directing the return of all security deposits wrongfully withheld, punitive damages as authorized by statute of up to twice the deposits wrongfully and willfully withheld, a declaration that Defendants forfeited any right to retain any portion of such deposits by failing to provide timely itemized statements, and such other relief as the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION — VIOLATION OF THE FEDERAL FAIR HOUSING ACT (42 U.S.C. §§ 3601–3617)

311. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

312. 42 U.S.C. § 3604(b) makes it unlawful "to discriminate against any person in the

terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." As per 24 C.F.R. § 100.600, sexual harassment is a form of unlawful discrimination.

313. At all relevant times, Defendants were "housing providers" and "persons" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(d), engaged in the business of leasing and managing residential dwellings within the Southern District of New York.

314. Defendants, acting individually and through their agents and employees, including but not limited to former superintendent Adnan Hoti and current superintendent Benny Bicaj, have engaged in unlawful housing practices in violation of 42 U.S.C. §§ 3604(b), 3604(f), and 3617, and the implementing regulations at 24 C.F.R. §§ 100.65, 100.600, and 100.400, by:

a. Subjecting female tenants, including Sierka and Bare, to sexual harassment and unwanted advances, including entering or lingering in tenants' apartments without legitimate work purpose, making personal and suggestive remarks, requesting alcohol while on duty, and making late-night phone calls at 2–3 a.m. that were intrusive and sexually suggestive in nature;

b. Conditioning or implying that housing-related services or repairs would be provided only if female tenants acquiesced to social or personal contact with Defendants' agents, constituting quid pro quo sexual harassment within the meaning of 24 C.F.R. § 100.600(a)(1);

c. Denying male tenants housing-related services or repairs that were offered to female tenants;

d. Creating and perpetuating a hostile housing environment that was severe and pervasive, unreasonably interfering with Plaintiffs' use and enjoyment of their

homes and creating an intimidating, degrading, and offensive atmosphere on the basis of gender;

e. Failing to take prompt and effective remedial action after receiving actual and constructive notice of the harassment and hostile environment through tenant complaints, written communications, and public reports concerning Adnan's misconduct; and

f. Retaliating, coercing, and intimidating tenants, including Plaintiffs and other members of the putative class, for engaging in protected activity—such as reporting code violations, unsafe or unsanitary conditions, or harassment to management, 311, or city agencies—in violation of 42 U.S.C. § 3617. Retaliatory conduct included verbal threats, accusatory statements ("I know you called 311"), deliberate delay or denial of repairs, and the creation of an atmosphere of fear and reprisal intended to deter tenants from exercising their lawful rights.

315. Defendants' actions and omissions were intentional, willful, and taken in reckless disregard of Plaintiffs' federally protected rights. Defendants are vicariously liable for the conduct of their employees and agents under principles of respondeat superior and the Fair Housing Act's non-delegable duties.

316. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other affected tenants have suffered injuries including, but not limited to, emotional distress, humiliation, anxiety, fear within their own homes, loss of use and enjoyment of their dwellings, relocation expenses, and other economic and noneconomic damages.

**TWELTH CAUSE OF ACTION — VIOLATION OF THE FAIR DEBT COLLECTION**

**PRACTICES ACT (15 U.S.C. § 1692 et seq.)**

317. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

318. Defendant Samson Management LLC is a "debt collector" within the meaning of 15 U.S.C. §1692a(6) in that it regularly collected or attempt to collect rent, arrears, and other charges on behalf of Defendant 160 Front Street Associates LLC, a separate legal entity that owns the Building, thereby making it an entity that regularly collected debts owed to another.

319. During the Class Period, the Management Company used the mails, electronic communications, and telephone to demand payment of rent, arrears, and purported lease-termination charges from Plaintiffs and other tenants and former tenants, even while the Building was in gross violation of the warranty of habitability and while essential services were unlawfully withheld.

320. In doing so, the Management Company:

a. made false, deceptive, and misleading representations concerning the legal status and amount of the alleged debt, in violation of 15 U.S.C. §1692e;

b. threatened legal action and enforcement of leases they knew or should have known were void or unenforceable due to uninhabitable conditions, in violation of §1692e(5);

c. attempted to collect sums not legally owed, including full rent during periods of constructive eviction and withholding of security deposits, in violation of §1692f(1); and

d. engaged in harassing and coercive communications intended to intimidate tenants from asserting their legal rights, in violation of §1692d.

321. The Management Company's collection activities occurred through written letters, emails, phone calls, and correspondence sent in interstate commerce, each constituting separate violations of the FDCPA.

322. As a direct and proximate result of the Management Company's unlawful conduct, Plaintiffs and Class members suffered actual damages including emotional distress, anxiety, and loss of time and resources in responding to unlawful collection attempts, and are entitled to statutory damages up to $1,000 per plaintiff, plus actual damages, costs, and reasonable attorney's fees pursuant to 15 U.S.C. §1692k.

## THIRTEENTH CAUSE OF ACTION — VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(c))

323. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

324. This cause of action is brought pursuant to 18 U.S.C. §§ 1962(c) and 1964(c), which provide a civil remedy for persons injured in their business or property by reason of a pattern of racketeering activity conducted through an enterprise engaged in interstate commerce.

325. At all relevant times, 160 Front Street Associates LLC, Samson Management LLC, and Samson Funding Corporation constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4). The enterprise was an association-in-fact composed of related entities for the common purpose of collecting rent, withholding deposits, and maximizing profit through fraudulent, coercive, and unlawful means.

326. Each of these companies had different roles in the enterprise. 160 Front Street Associates LLC's role was to be the title holder of the Building, and as such the legal party on all

legal proceedings seeking to collect illegal and inflated rent payments from non-paying tenants. Samson Management LLC's role was to manage the Building and collect illegal and inflated rent amounts from existing tenants. Samson Funding Corporation's role was to provide the financing and also to divert funding collected by the Owner and the Management Company towards the *enterprise* instead of towards the maintenance of the Building. Each Defendant functioned as a separate entity whose purpose was to extract and conceal unlawful rent and deposit payments.

327. The association-in-fact enterprise affected interstate commerce by utilizing interstate wires, mail systems, and electronic payment networks in furtherance of its scheme by transmitting rental demands, payment confirmations, and tenant communications via interstate wire and banking systems, including credit card and ACH payment networks.

328. Beginning at least as early as November 2020 and continuing through the present, Defendants, acting individually and in concert, conducted and participated in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5), consisting of repeated acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

329. Specifically, Defendants knowingly and intentionally engaged in a fraudulent scheme to obtain money from tenants and former tenants of the Building by:

a. sending rent invoices / rent demands, fourteen day notices, and collection letters and notices through the U.S. mail and interstate email systems that falsely represented that full rent were legally owed notwithstanding conditions that rendered the premises uninhabitable;

b. sending such documents while having actual knowledge that the conditions of the Building rendered it uninhabitable;

c. diverting and misappropriating tenant funds that had been expressly represented as earmarked for building security improvements, including the installation of lobby and exterior surveillance cameras. Defendants repeatedly informed tenants, through emails, building-wide notices, and oral statements, that cameras would be installed to improve safety and that portions of rent and building improvement surcharges were allocated for that purpose. In truth, Defendants never installed functioning security cameras at 160 Front Street and instead retained and converted those funds for their own benefit.

330. These false statements and diversions were carried out through the U.S. mail and interstate wire communications and constitute predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

331. Each mailing, email, or debt-collection communication in furtherance of this scheme constitutes a separate predicate act of mail or wire fraud. The predicate acts are related and continuous, sharing the same purpose (to unlawfully obtain tenants' money and conceal Defendants' misconduct), the same participants (Defendants), and the same victims (current and former tenants). These acts occurred regularly and repeatedly over multiple years and thus constitute a pattern of racketeering activity within the meaning of the statute.

332. As a direct and proximate result of Defendants' racketeering activity, Plaintiffs and Class members have been injured in their property within the meaning of 18 U.S.C. § 1964(c) by, among other things:

a. paying rent and fees that were fraudulently demanded under false pretenses of legal entitlement;

b. incurring out-of-pocket costs to dispute and defend against unlawful collection

efforts and retaliatory lawsuits; and

c. suffering damage to their credit and reputations due to Defendants' false representations of indebtedness.

333. Defendants' conduct was willful, deliberate, and undertaken with reckless disregard for federal law. The racketeering scheme continues through ongoing rent collection, communications with tenants, and use of the mail and wires to perpetuate fraud and extortion.

334. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and Class members seek recovery of threefold the damages they have sustained, together with the costs of suit and reasonable attorney's fees, and such further relief as this Court deems just and proper to prevent further racketeering activity and unjust enrichment by Defendants.

**FOURTEENTH CAUSE OF ACTION — DECLARATORY AND INJUNCTIVE RELIEF**

335. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

336. An actual, justiciable controversy exists regarding Defendants' ongoing compliance with the warranty of habitability and with applicable code standards governing sanitation, pest control, building security, and related essential services. Plaintiffs and the Class seek a declaration of their rights and Defendants' duties and an injunction to prevent continuing and future violations.

337. Plaintiffs seek a judgment declaring that: (a) the conditions alleged—chronic garbage accumulations, pervasive vermin, and prolonged failures of the entrance door, intercom/buzzer, and lobby CCTV—violate the warranty of habitability and applicable provisions of the NYC Housing Maintenance Code and Multiple Dwelling Law; (b) Defendants

must operate, maintain, and repair the Building in a manner consistent with those standards; and (c) any retaliation for good-faith complaints, 311 reports, or participation in this action is unlawful.

338. Plaintiffs seek preliminary and permanent injunctive relief requiring Defendants to implement and maintain, at minimum, the following measures on a Building-wide basis, subject to Court oversight:

a. Sanitation: adopt and adhere to a written sanitation plan with regular, documented collection schedules sufficient to prevent chute blockages and accumulations; provide adequate refuse capacity; and promptly remediate any overflow conditions.

b. Integrated pest management: retain a licensed extermination vendor to implement a comprehensive IPM program (inspection, sealing/harborage elimination, baiting/trapping, and follow-up) on a recurring schedule; document visits and findings; and provide tenants with advance notice and post-service reports.

c. Building security: repair or replace the Building's entrance door hardware so the door self-closes and latches; restore and maintain functional lobby CCTV covering entrances and package areas with appropriate retention; and repair/replace unit intercom/buzzer systems to ensure reliable operation.

d. Remediation timelines: complete the above remedial steps within Court-ordered timelines, with interim milestones and status reporting to Plaintiffs' counsel.

e. Access and coordination: provide reasonable access windows for apartment and common-area work; offer alternative dates as needed; and maintain a tenant contact channel for scheduling and issues.

f. Monitoring and compliance: file quarterly compliance reports (with vendor logs

and photographs where applicable) for a period of not less than twelve (12) months, and thereafter as the Court deems appropriate; permit reasonable third-party inspection or a neutral monitor if compliance falters.

g. Non-retaliation: refrain from any adverse action, threats, or harassment against tenants for reporting conditions, cooperating with inspections, or participating in this litigation, and post written tenant-rights notices in common areas.

339. Necessity and balance of equities. Money damages alone cannot remedy ongoing health and safety risks and loss of habitability. The requested injunction maintains the status quo of lawful, code-compliant operations, prevents irreparable harm, and serves the public interest. The balance of equities favors Plaintiffs and the Class.

340. Plaintiffs request that the Court retain jurisdiction to enforce and, as needed, modify injunctive provisions to ensure durable compliance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request:

1. Certification of the Class pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3); appointment of Plaintiffs as Class Representatives; and appointment of DGW Kramer LLP as Class Counsel pursuant to Rule 23(g);
2. Declaratory Relief, declaring that Defendants' acts, omissions, and practices described herein violate the Fair Housing Act (42 U.S.C. §§ 3601–3617), the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.), the Racketeer Influenced and Corrupt

Organizations Act (18 U.S.C. § 1962(c)), and New York State and City law;

3. Injunctive Relief, permanently enjoining Defendants, their officers, agents, servants, employees, successors, and assigns, and all persons acting in concert with them, from continuing the unlawful, fraudulent, and retaliatory practices alleged herein, and requiring Defendants to:
    a. Abate and remediate all unsafe, unsanitary, and unlawful conditions at 160 Front Street;
    b. Implement and maintain adequate security measures, including functioning surveillance cameras and door-lock systems;
    c. Establish and enforce anti-harassment and anti-retaliation policies consistent with the Fair Housing Act;
    d. Cease and desist all unlawful rent-collection, debt-collection, and credit-reporting practices; and
    e. Provide an accounting and restitution of all tenant funds wrongfully retained or misused;
4. Damages to Plaintiffs and Class members, including but not limited to:
    a. Compensatory damages for rent overpayments, loss of use and enjoyment, property loss, and emotional distress;
    b. Statutory damages under the Fair Debt Collection Practices Act (15 U.S.C. § 1692k);
    c. Treble damages under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964(c));
    d. Punitive damages under the Fair Housing Act and New York law for Defendants'

willful and wanton misconduct; and

   e. Restitution and disgorgement of all funds wrongfully obtained from tenants;

5. Equitable Relief, including the imposition of a constructive trust over all tenant funds collected or retained for safety, maintenance, or capital improvements, including but not limited to surcharges and deposits purportedly allocated for security-camera installation, and an order requiring Defendants to transfer and account for such funds under Court supervision;
6. Attorneys' Fees and Costs as provided by the Fair Housing Act (42 U.S.C. § 3613(c)(2)), the FDCPA (15 U.S.C. § 1692k(a)(3)), RICO (18 U.S.C. § 1964(c)), and applicable state law;
7. Pre- and Post-Judgment Interest as permitted by law; and
8. Such other and further relief as the Court deems just, equitable, and proper.

**JURY DEMAND**

Plaintiffs and class demand a trial by jury on all issues so triable as of right.

Dated: November 11, 2025

DGW Kramer LLP

By: /s/ Jacob Chen
Jacob Chen, Esq.
Attorneys for Plaintiffs
45 Rockefeller Plaza, 20th Floor
New York, NY 10111
917-633-6860